UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__6/22/2021__
```

----------------------------------------------------------------------X
                                 :

YANA IVANOV,                         :

              Plaintiff,      :

                                 :          19-cv-3422 (LJL)

      -v-                        :

                                 :     OPINION AND ORDER

BUILDERDOME, INC. & ALEX ROZENGAUS,   :

             Defendants.    :

                                 :
----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Yana Ivanov ("Ivanov") initiated this lawsuit against Defendants Builderdome

Inc. ("Builderdome") and Alex Rozengaus ("Rozengaus" and, collectively with Builderdome

"Defendants"), alleging that Defendants failed to pay her minimum wages as required under the

Federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215, and the New York Labor Law

("NYLL"), N.Y. Lab. L. §§ 650-65.  Plaintiff also brought state common law claims for breach

of contract and unjust enrichment and statutory claims for gender and pregnancy discrimination

under the New York States Human Rights Law ("NYSHRL") and the New York City Human

Rights Law ("NYCHRL").  The Court conducted a one-day bench trial on May 3, 2021.  For the

reasons that follow, the Court finds for Defendants on all counts.

## BACKGROUND

      Plaintiff filed her complaint on April 17, 2019.  Dkt. No. 1 (the "Complaint").  Plaintiff

filed a motion for summary judgment on May 1, 2020, arguing that the terms of her agreement

with Builderdome established that she was an employee under FLSA and the NYLL as a matter

of law.  Dkt. No. 33.  Her agreement with Builderdome (the "Agreement") was entitled

"Employment Agreement" and characterized her as an "Employee" and Builderdome as her "Employer." Dkt. No. 1, Ex. A. On September 28, 2020, the Court issued a Memorandum and Order denying Plaintiff's motion for summary judgment. Dkt. No. 40. The Court reasoned that Plaintiff's title under the Agreement was not dispositive of her status under FLSA and the NYLL. The Court held that Plaintiff's status should be determined by the economic reality of the relationship and not solely by what the parties called the relationship. *See* Dkt. No. 40 at 7, 9.

By letters dated February 14, 2021 and February 15, 2021, the parties consented to trial of this case to the bench. Dkt. Nos. 43, 44. Defendants asked that the trial be conducted physically in open court, in the United States Courthouse, emphasizing that witness credibility was at issue. Dkt. No. 43. Plaintiff consented to a bench trial but "requested that the trial be conducted by video in order to protect the health and safety of the Court, its staff, the parties, and counsel." Dkt. No. 44. The Court sided with Defendants, ruling that "[n]o party has identified any good cause . . . which would cause the Court to depart from the preference reflected in the Federal Rules for trials 'in open court.'" Dkt. No. 45 (quoting Fed. R. Civ. P. 43)).

The Court conducted a one-day bench trial on May 3, 2021. Two witnesses testified—Ivanov and Rozengaus. Pursuant to the Court's order, at Dkt. No. 45, the Court received the direct testimony of each witness by declaration.[1] *See Ball v. Interoceanica Corp.*,

---

[1] Ivanov's declaration was received without objection. Plaintiff objected to certain portions of the Rozengaus declarations as hearsay. She also objected to Rozengaus's discussion of the oral conversations and understandings he had with Ivanov on grounds of the parol evidence rule. The Court reserved on Ivanov's objections but will now rule. The objection to paragraph 16 is sustained, the objection to the first sentence of paragraph 18 is sustained, and the objection to the remainder of the paragraph is overruled. The objection to paragraph 19 is overruled except to the extent that it refers to conversations with "any one else at Builderdome." The objections to paragraphs 28, 32 and 33 are overruled.

71 F.3d 73, 77 (2d Cir. 1995) (approving "the procedure allowing the parties to produce direct evidence from their witnesses in writing while permitting subsequent oral cross-examination—particularly when the parties agree to that procedure in advance.").  Each party was permitted to cross-examine the witness proffered by the other party, followed by redirect examination and then re-cross.  In addition, the Court received into evidence the entire deposition transcript of the deposition of Ivanov and selected excerpts offered by Plaintiff from the deposition of Rozengaus. The following constitute the Court's findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52.

## FINDINGS OF FACT

Ivanov is a Russian national with a background in visual design with experience working for start-up companies. Tr. 16:20-24, 33:13-14.

Builderdome was a start-up company based in New York.  The company never successfully developed a product.  The idea behind the company was to create a nationwide digital platform for contractors and builders to bid on projects submitted by homeowners for repairs and renovations to their homes.  Ivanov Aff. ¶ 22; Rozengaus Aff. ¶ 1.  Homeowners would use the application to complete a questionnaire providing details of their project.  Ivanov Aff. ¶ 23.  A scope of work would then be generated and, based upon that scope of work, contractors would make and submit bids for the job.  *Id.*  Builderdome would make money through a commission or fee from the contractor.  *Id.* ¶ 23; Rozengaus Aff. ¶¶ 2-4; Rozengaus Dep. 46:1-46:9.  In essence, the idea behind Builderdome was to serve as "a broker platform" for the construction business.  Rozengaus Dep. 46:9.

Defendant Rozengaus was one of the founders of the company.  He is also a Russian national and occasionally he and Ivanov would speak in Russian.  Rozengaus's background is in

construction but he also started, but did not complete, coursework for a degree in computer science. Tr. 87:4. An individual named Boris Coto ("Coto") joined Builderdome six months after Ivanov. Coto was a friend of Ivanov's and Ivanov introduced him to the company. Ivanov had a romantic relationship with Coto after they both joined Builderdome. Ivanov and Coto had two children together but later split up and Ivanov subsequently sued Coto for child support. They no longer have a relationship. Tr. 27:14-29:15, 76:7-22.

Rozengaus had grand ambitions for Builderdome. Several months after its founding, the company's business plan projected that it would earn gross revenue of $262,956,859.00 in the three-year period following its launch. Rozengaus Aff. ¶ 5; Tr. 89:14. According to Ivanov, Rozengaus indicated to her that he hoped Builderdome would generate "high millions" in income. Ivanov Dep. 9:1-10:16. Rozengaus testified that he told her it "potentially [could] be a multi-billion dollar company." Tr. 92:10. At another point, an executive summary Rozengaus circulated to a potential investor forecasted revenue "in the $3.5 billion range" in the company's first three years. Rozengaus Suppl. Decl. Ex. Wallace Emails at 3.

In or about June 2015, Plaintiff posted her resume on Indeed.com, a website dedicated to matching potential employers and employees. Ivanov Aff. ¶13. On June 30, 2015, Rozengaus emailed Plaintiff that he had seen her resume on Indeed and asked if Plaintiff was interested in a job opening at Builderdome. Ivanov Aff. ¶ 14; Ex. 8; Tr. 88:6-16. His email asked her to reply if she was interested in discussing "the following business opportunity. JOB DETAILS *Job Title:* Software Engineer *Company:* Builderdome Inc." Ex. 8 at 1. Rozengaus's email, populated with the heading "Software Engineer job opening- Yana", described Builderdome as "an early-stage venture located Brooklyn NY" and stated "[w]e are inventing a new way of doing things for an industry, pushing the boundaries of technology, creating products from

4

scratch and defining our future as we go." *Id.* Rozengaus stated: "Exciting stuff. We are always looking for talented, creative, adventurous individuals that want to make an impact now. Join us!" *Id.*

At the time Rozengaus emailed Plaintiff, she had never before met or heard of Rozengaus or Builderdome. Ivanov Aff. ¶15. Ivanov responded that she was interested but that she was "a designer not a developer." Ex. 8 at 1. She pointed out that she was "taking some front end development courses on line" because it was a subject of interest and that she wanted to be involved with "UX/UI Design." *Id.* She asked if Builderdome had "opportunities in this area." *Id.* Rozengaus responded that he did have "openings" in Rozengaus's field of expertise and asked if she was available for a face-to-face meeting." *Id.*

Ivanov and Rozengaus met on July 17, 2015. Ivanov Aff. ¶¶19, 20; Ex. 5. The meeting took place at Rozengaus's office at Avenue U and East 19th Street in Brooklyn, which Ivanov described as a "small one-room office with one window." Tr. 13:25-14:3, 51:5-7. No staff was present and Ivanov immediately observed that Builderdome was a "startup company." *Id.* 14:17-15:6. Rozengaus explained to Ivanov that he needed talented people to get the company off the ground. *Id.* 15:4-6. There was no discussion about salary or the hours that Ivanov would have to put in at the job. *Id.* 15:7-12. Rather, Rozengaus explained to Ivanov that he needed her "to create a visual appeal that he could show potential investors." *Id.* 15:15-16. Rozengaus's dream was to turn the company in to a "multi hundred million dollar company," or even a multi-billion dollar company. *Id.* 15:17-20, 92:5-8. Ivanov believed in the idea and agreed to join the company after he told her that he had no worries that he would find the money to fund the company. *Id.* 16:8-14.

The day after the meeting Rozengaus emailed Ivanov the Agreement, which he described in the cover email as an "Employment Agreement." Ex. 5 at 4. The Agreement was drafted by Rozengaus. Ex. 3; Ivanov Aff. ¶ 5; Rozengaus Dep. 13:6-14:5, 19:21-25:22. To save money on legal fees, Rozengaus downloaded a written agreement from an internet search he had conducted a few days earlier and made modifications based on the oral agreement he made with Ivanov. Rozengaus Dep. 13:9-14:5, 19:3-25. Ivanov signed it after making only minimal corrections. Tr. 18:4-10, 21:2-10, 25:1-18, 50:6-9.

The Agreement reflects that it was "made and entered into" on July 20, 2015, but it was signed by each of Rozengaus and Ivanov on August 25, 2015. Ex. 3 at 3. Because the language and terms of the Agreement are important, the Court describes them at length. Rozengaus signed on a signature block for the "Employer's Signature" and printed his name over a block entitled "Employer's Name Printed." *Id.* In a spot designated for the "Employer's Title," Rozengaus identified himself as CEO. *Id.* Ivanov signed in a signature block for the "Employee's Signature" and printed her name in a block for the "Employee's Name Printed." *Id.* The Agreement recites in a whereas clause that "the Employer desires to obtain the benefits of the services of the Employee, and the Employee desires to render such services on the terms and conditions set forth." *Id.* at 1. Ivanov is referred to throughout as the "Employee," but reflecting the fact that Rozengaus based the Agreement off of a generic form, the Agreement uses the masculine pronoun for Ivanov. It states: "The Employee shall be employed in the capacity of Creative director [sic] and is required to perform duties as may arise from time to time and as may be assigned to the Employee." *Id.* The Agreement also states:

> The Employee agrees that he will at all times faithfully, industriously, and to the best of his/hers skill, ability, experience and talents, perform all of the duties required of his position. In carrying out these duties and responsibilities, the employee shall comply with all Employer policies, procedures, rules and

regulations, both written and oral, as are announced by the Employer from time to time. It is also understood and agreed to be the Employee that his assignment, duties and responsibilities and reporting arrangements may be changed by the Employer in its sole discretion without causing termination of the agreement.

*Id*.

The Agreement did not set forth any salary for Ivanov. Rather, the Agreement stated that it was "understood by the Employee that he [sic] will not be compensated until seed round close[d]." *Id*. ¶ 3(a). It stated: "The employee agrees to get compensated only after the Employer gets funded." *Id*. ¶ 3(b). Once Builderdome received funding, "[t]he compensation will include the one percent (1%) of the sock [sic] equity based on the following vested schedule." *Id*. The Agreement then set out a vesting schedule according to which through the funding period, "neither Employer's nor Employee's shares will vest." *Id*. ¶ 3(b)(i). One year after Builderdome received funding, 25% of Ivanov's shares would vest. *Id*. ¶ 3(b)(ii). Two years after funding, 50% of her shares would vest. *Id*. ¶ 3(b)(iii). Following three years of funding, 75% of the shares would vest, and finally after four years of funding (the "Full Vesting Date"), 100% of the shares would vest. *Id*. ¶¶ 3(b)(iv), 3(b)(v). The Agreement included the following additional provisions:

> The Employer guarantees the full-time position depending on the substantial amount of funding required to complete the project and the compensation will be based on the market salary based on the experience.
>
> If at any point the Employee decides to terminate his employment before the funding stage, The Employer guarantees to reimburse the Employee for the unpaid period only if the Employee made substantial contribution to the project and the reimbursement will accrue only after and if the Employer gets funded.

*Id*. ¶¶ 3(c)-(d).

The Agreement provided that: "Vacation, Benefits, Stock Venting [sic] period and Performance Reviews would be determined during full-time employment negotiation." *Id*. ¶ 4.

Finally, the Agreement contained an integration clause pursuant to which the parties agreed that it "contains the entire agreement between the parties, superseding in all respects any and all prior oral or written agreements or understandings pertaining to the employment of the Employee by the Employer and shall be amended or modified only by written instrument signed by both of the parties hereto." *Id*. ¶ 7.

Ivanov worked with Builderdome as Creative Director from July 2015 until approximately November 2017.  Ivanov Aff. ¶¶ 24, 28.  Plaintiff was the only person at Builderdome responsible for the duties entrusted to her.  *Id.* ¶ 25.  In her capacity as Creative Director, she was generally responsible for all the visual aspects of creating and maintaining Builderdome's website and mobile application.  *Id.* ¶ 24.  For most of the time Ivanov worked for Builderdome, she worked from home.  Tr. 29:23, 31:1-8.  Her work hours varied.  Tr 29:24-30:2.  Although she claims to have worked full-time, sometimes her work week was lasted more than 40 hours and sometimes it was "a little bit less."  Tr. 78:6-7.

During the time Ivanov worked with Builderdome, she was also employed on a monthly retainer for another company, receiving a monthly payment for an indeterminate amount of work.  Tr. 29:16-19.  She also took on "probably" more than 20 freelance projects which she bid on for other companies.  Tr. 46:1-47:10.   When she began to work for Builderdome, the company was busy "build[ing] the visuals," and Ivanov accordingly took on only a few hours of freelance work for other clients per week.  *Id*. 47:3-6.  Later on, when there was less work to do at Builderdome, she might work 10 hours a week.  *Id*. 47:9-10.

Ivanov had no prescribed hours of work.  She did not receive direction when to start her work on a particular project.  Tr. 29:24-30:2.  Nor was she told when to start and when to finish the work day.  Tr. 30:3-5.  Rozengaus "just cared if the work was done."  Tr. 30:5.  Ivanov

testified simply: "if I had a job [to do], I did it."  Tr. 30:13.   She was not required to and did not

check with Rozengaus or Builderdome before taking on work for other companies or engaging in

that work; she simply fit it into her schedule with the work she had to do for Builderdome.  Tr.

47:11-16; Ivanov Dep. 28:21-29:15.

Several other individuals joined the project to launch Builderdome during the period

when Ivanov was working for the company.  When she started, there were only two people

working on Builderdome—herself and Rozengaus.  Tr. 74:20-21.  Six months after she started

work, Ivanov recruited Coto to join the Company as Chief Technology Officer.  Tr. 74:21;

Rozengaus Dep. 60:4-6.  A few other people came in and out of the company including a

"short-term content writer who was writing blogs to try to get people" onto the website and a

front-end developer.  Tr. 74:23-75:2; *see also* Rozengaus Dep. 46:19-48:19.  Rozengaus

considered all of these people to be "partners" and not employees.  *Id*. 46:10-18.  They all agreed

to terms identical, except with respect to ownership percentages, to those reflected in the

Agreement between Rozengaus and Ivanov.  *Id.* 56:6-57:14.

The only regular event Ivanov attended was a group meeting the team held on Saturdays

at Builderdome's small office in Brooklyn, which was held except when "somebody couldn't

make it or Alex [Rozengaus] wasn't []available."  Ivanov Aff. ¶ 48, Tr. 51:9-11.  The group

would "discuss what needed to be changed, what next steps [it] would be taking" and

"[s]ometimes [it] would . . . work on the pitch deck together."  Tr. 51:16-19.  The meetings

functioned as "brainstorming session[s]."  Tr. 120:2-3.  The participants would discuss what was

needed to increase Builderdome's chances for funding.  Tr. 120:3-4. In addition, Ivanov and

Rozengaus had daily electronic communications.  Ivanov Aff. ¶ 48.

Ivanov worked on several projects for the company, including pitchbooks to be used with prospective investors, a design for the company's mobile application and its website, and a design for the questionnaire to be used by homeowners. Tr. 48:1-18, 74:1-17. There is no dispute that Plaintiff was qualified for all positions she held at Defendant Builderdome. Tr. 88:7. The record reflects that Rozengaus provided few comments on her work. He provided feedback on the questions to be included in the questionnaire—which fell within his sphere of expertise, Tr. 34:14-37:1—but other than telling Ivanov whether he liked something or not, Rozengaus did not provide direction with respect to design. Tr. 37. For example, the record does not reflect that Rozengaus provided comments on the mockups.

The record reflects that the two operated as partners and as colleagues, with Rozengaus taking the more senior role and providing direction. For example, at one point, Rozengaus interviewed a prospective team member who would draft the content for Builderdome's advertising and blog posts. Although Rozengaus engaged in the initial outreach, no decision was made to add the writer to the team until after Rozengaus shared that information with Ivanov and Ivanov reviewed her writing and opined that the company should meet with her. Tr. 53:14-24, 55:7-22.

The primary activities of Builderdome during the time Ivanov worked with it related to raising the funds necessary to operate the website and to market the mobile application. When Ivanov first began working with Builderdome, it was her expectation and Rozengaus's that the company would be funded within three or four months. Tr. 17:11-14; Ivanov Dep. 11:23-24, 48:15-24. Rozengaus stated that he knew "a lot of people" and that he "wasn't worried about getting funding." Ivanov Dep. 12:2-13. As a consequence, Ivanov's initial work involved developing a brand and creating mockups of the website and the mobile application and business

cards and letterheads—"enough to show investors to get money."  Ivanov Dep. 13:16-17.[2]  The

expected date for receiving funding, however, continually slipped.  Ivanov testified that "[e]very

. . . maybe five to six months, we would have discussions regarding funding problems and we

would rework a pitch deck [for] potential investors, and we would change things on the website.

. . .  Every time it would be something else we had to change to get potential funding."  Ivanov

Dep. 27:6-14.  Ivanov further testified: "Every few months, we would get our hopes up, and it

wouldn't work out.  Then we would get our hopes up, and it wouldn't work out."  Ivanov Dep.

49:16-19.  In Ivanov's words, she kept asking Rozengaus when the company would receive

funding, and "[h]e kept telling us, oh, I'm waiting for this guy.  He's going to fly in.  This

happened every other month, kept delaying, kept delaying.  I felt like a horse with a carrot in

front of my nose."  Ivanov Dep. 46:5-9.

   Rozengaus was responsible for locating potential investors but the entire team working

with Builderdome was responsible for obtaining the funding and meeting with investors.

Rozengaus Dep. 26:8-27:10.  Toward the end of 2016, a personal friend of Rozengaus's, who

---

[2] Ivanov testified that Rozengaus told her that, after the Company was funded, he would
compensate her for the time she invested up to that point and also testified that she expected to
be paid at least the minimum wage after the company received funding.  Tr. 21:7-10.  To the
extent that Ivanov meant to suggest that Rozengaus promised her that she would be paid the
minimum wage, the Court does not credit that testimony.  Ivanov's testimony was inconsistent
about whether she would be paid the minimum wage for hours that she worked or her fair market
value and was also inconsistent about whether her expectation was that she would be paid an
hourly rate only going forward or retroactively for time that she previously worked.  It is
undisputed, however, that Rozengaus gave her no instructions about the hours that she was to
work for Builderdome and that Ivanov never sent anything to Rozengaus or anyone else at the
company setting forth the hours she put into the company.  Ivanov Dep. 33:3-6.  There is no
evidence that she kept records of those hours.  The more logical inference, and the one the Court
draws, is that the parties discussed that after the Company received funding, if Ivanov continued
to work for it, she would receive sufficient value from her equity interest and from the promise
of future employment that such value would make up for the uncompensated hours she worked
on developing the company.

also was a technology investor, expressed interest in providing funding for Builderdome and offered approximately $1 million or $1.5 million in funding in exchange for at least half of Rozengaus' interest in the company.  Ivanov Aff. ¶ 77; Tr. 71:9-12, 97:19-98:6, 123:1-13; Rozengaus Dep. 33:16-19, 36:15-18.  Rozengaus discussed the offer with the team working on Builderdome, including Ivanov, as well as with others in the venture capital field.  Rozengaus Suppl. Aff. ¶ 3.  Ultimately, Rozengaus made the decision not to accept the offer but instead to stall both because the interest the investor was demanding would have given him control of the company and because the non-standard nature of the proposed transaction would make it difficult for Builderdome to raise from others the tens of millions it would ultimately need to launch and operate the business.  Tr. 100:15-101:10, 123:7-124:10, 127:6-128:15, 135:20-136:6; Rozengaus Dep. 37:4-22; Rozengaus Suppl. Aff. ¶¶ 1-9.

Shortly after the offer was made, and sometime after January 2017, the potential investor announced that his plans had changed and withdrew the offer.  Tr. 128:21-29:5; Rozengaus Suppl. Decl. ¶ 8.  Although Rozengaus reached out to other potential investors, including agent investors and venture capitalists, he did not attract any other investor interest and was not able to obtain any investor meetings.  Tr. 98:12-99:2.  At one point, he and Ivanov and others met with a group of technology entrepreneurs doing business as an "accelerator" in an attempt to attract their interest in investing in Builderdome and to attract additional investor interest for the company, but after one meeting the accelerator cancelled future meetings because it had insufficient funds.  Tr. 99:3-100:14, 104:9-14.

Thereafter, Builderdome decided to reduce the size of the investment it was seeking to only such amount as would be necessary to validate its product.  Builderdome planned to raise

additional funds if the idea was validated.  The lender who provided the funds for validation then would receive a small percentage of the company.  Tr. 110:1-24, 117:6-118:15, 125:5-23.

Ivanov was not paid any salary, wages, compensation or other remuneration of any kind during the approximately two years she worked with Builderdome. Ivanov Aff. ¶ 28.  Nor, however, did she ever ask to be paid.  Rozengaus Aff. ¶ 19.  As Ivanov again put it, "I never said pay me, but I did complain.  I kept asking him. When are we going to get funding."  Ivanov Dep. 46:3-13.

In the fall of 2016, Plaintiff became pregnant by Coto.  Ivanov Aff. ¶ 67.  Coto informed Rozengaus of the pregnancy.  Rozengaus Dep. 59:5-60:3, 62:13-17.  Although Ivanov continued to work after the birth of her children, she stopped coming to in person meetings and started to do meetings remotely over Skype.  Rozengaus Aff. ¶ 31.  She then informed Rozengaus that she would not participate in future Skype meetings because she did not have the time to join meetings but would be informed by Coto of progress during meetings that she could not attend.  Rozengaus Aff. ¶ 32; Tr. 105:7-18.  Ivanov also made it clear that she would not be able to attend any meetings with investors.  Tr. 105:7-18.

After Ivanov became pregnant, Rozengaus unilaterally changed her status on the Builderdome listing on the website from "creative director" to "designer consultant."  Tr. 105:22-106:9.  Rozengaus made the change because Ivanov had made clear she could not attend meetings with prospective investors and because the company did not want to list as a director a person it would not be able to produce for investor meetings.  Rozengaus Aff. ¶ 34.

After Ivanov became pregnant and at the time Builderdome was seeking only a small "seed" investment, it made the decision to reduce the number of names it presented on its website to limit it to Rozengaus and Coto and to make the team appear "as lean as possible" on

the theory it would be easier to arrange a meeting with a potential investor for the two of them rather than attempt to schedule it with other persons who were working only part time. Rozengaus Dep. 66:20-67:8. At the same time, Ivanov's profile was removed from the website to list only actively participating members to present to investors as lean a team as possible. Rozengaus Dep. 66:6-16.  This was done with Ivanov's knowledge and without her objection. Rozengaus Aff. ¶ 38.

In or about November 2017, Plaintiff noticed that her photo and biography had been removed from the company website and from a website called Angel.com, which was designed to attract investors to start-up companies.  Ivanov Aff. ¶¶ 69, 70; Tr. 26:21-27:24; Rozengaus Dep. 66:6-18.  There was no evidence that Builderdome was responsible for Ivanov being listed as a former employee on Angel.com.  Tr. 38:11-13 (Ivanov testified that she cannot know "for sure" that Rozengaus listed her as a former employee and that she did not know who listed her as a past employee).[3]  Rozengaus was not responsible for the action.  Tr. 109:7-14.  Rozengaus and Builderdome never terminated Ivanov's employment with Builderdome.  Tr. 44:16-24.  Rather, Ivanov attributes her departure to "self-discovery"—noticing that her name was removed from the website and she was listed as a "former employee" on Angel.com.  Tr. 26:21-27:4.  However, Ivanov did not communicate with Rozengaus about being listed as a former employee.  Tr. 41:24-42:7.  She also did not speak to Coto about the issue.  Tr. 43:23-24.   She testified that her "life was hectic as it was by then" and that she "really didn't want anymore drama to be honest," but that she "felt offended" because Rozengaus was "basically treating [her] like [she] was nobody."  Tr. 43:2-8.  Indeed, the last conversation Ivanov had with Rozengaus was before Ivanov saw her name listed as a former employee when Rozengaus offered that if the company

---

[3] Ivanov testified that Coto was not aware of her being listed as a former employee.  Tr. 40.

as able to raise any money it would allocate funds to pay for her childcare for her to be able to contribute and remain on the team.  Tr. 42:1-7, 106:17-107:3.  Ivanov does not know if Builderdome hired someone to take her place.  Tr. 43:16-25.  In or about November 2017, upon seeing that she had been removed from the company website, Plaintiff simply ceased providing any services for Builderdome.  Ivanov Aff. ¶ 71.

At his deposition, Rozengaus testified that Ivanov stopped working for Builderdome after she gave birth because she "couldn't contribute anymore to the company," and that he told her "okay, let us make the push to see if we can get funded so you can start taking money from the company and you can come back and contribute or if you have other opportunities, then you find a way and you can contribute whatever you can, well, let me know."  Rozengaus Dep. 69:9-14.  He testified that that was the last conversation he had with Ivanov, because he believed Coto was communicating with her.  *Id.* 60:23-24.

The company never had a website that was functional or a web page that was posted on the internet.  Tr. 134:5-7.  The company never had any sales.  Tr. 73:20-22.  It did not make any money.  Rozengaus Aff. ¶ 39.  Everyone lost time and Rozengaus lost time and money.  *Id.* Builderdome was never funded.  Ivanov Aff. ¶ 76.  It ceased all activities "somewhere in the middle of 2017."  Rozengaus Dep. 36:12-14.  There is no stockholder or shareholder agreement designating how Builderdome profits are to be paid, when they would be paid, how much they would be, or any other detail.  Ivanov Aff. ¶ 57.  Ivanov is not now and never has been a stockholder, shareholder, or owner of Builderdome.  Ivanov Aff. ¶ 29.  She also did not invest any money in Builderdome.  Ivanov Aff. ¶ 30.  However, Rozengaus has agreed that Plaintiff

still has rights under the Agreement and that, if Builderdome ever raises funds, she will be entitled to the interest in the company specified under the Agreement.  Tr. 106:10-13.[4]

## CONCLUSIONS OF LAW

Plaintiff asserts claims under FLSA, and NYLL, breach of contract and unjust enrichment under New York law, and gender and pregnancy discrimination under NYSHRL and NYCHRL. The Court considers each set of claims in turn.

## I.    Fair Labor Standards Act

Plaintiff asserts first that she was an employee of Builderdome and that the company violated FLSA by failing to pay her a minimum wage, or any wage at all.  Plaintiff claims that had she been paid a minimum wage her compensation would have been $92,952 which amount includes interest running through July 1, 2019.  Ivanov Aff. ¶ 80; Ex. 10.[5]

The Court previously has described the standards for being an employee under FLSA and the NYLL.  FLSA tautologically defines an "employee" as an "individual employed by an employer."  29 U.S.C. § 203(e)(1).  "Employ" is defined as "to suffer or permit to work."  *Id*. § 203(g).  "Employer" is defined to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."  *Id.* § 209(d); *see also United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945) (reporting that "Senator Black said on the floor of the Senate that

---

[4] When Builderdome ceased activities, Rozengaus started another company called Builderdome Construction, which does business as a general contractor.  Rozengaus Dep. 41:22-42:25. Ivanov and Rozengaus both testified that a logo or concept of a logo she created with a couple of hours of work was being used by Rozengaus in connection with Builderdome Construction.  Tr. 78:21-79:8, 81:2-5.

[5] Defendants have not stated any objection or defense in this case respecting the interstate commerce requirement of FLSA.  Dkt. No. 19. *See* Fed. R. Civ. P. 8(b)(6) ("An allegation . . . is admitted if a responsive pleading is required and the allegation is not denied.").

the term 'employee' had been given 'the broadest definition that has ever been included in any one act.'") (quoting 81 Cong. Rec. 7657). Courts have developed a facts-and-circumstances test to determine whether a worker is an "employee" for purposes of the FLSA. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). The Second Circuit has held that the determination of who counts as an employee under the FLSA should be evaluated according to an "economic reality" test. *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988). The economic reality test looks to five factors: (1) the degree of control exercised by the employer over the worker; (2) the worker's opportunity for profit or loss and their investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship; and (5) the extent to which the work is an integral part of the employer's business. *Id.* "No one of these factors is dispositive; rather, the test is based on a totality of the circumstances." *Id.* at 1059. "The ultimate concern is whether, as a matter of economic realty, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Id.*

Applying the relevant factors, the Court concludes that Ivanov was not an employee of Builderdome. With respect to the first factor, Builderdome exercised little if any control over Ivanov. Ivanov was engaged generally to improve the visual image for Builderdome through its website and mobile application and in its pitchbooks. Within those general parameters, Ivanov had virtually unfettered discretion as to how she performed her work. Therefore, her relationship with Builderdome partakes of all of the characteristics of an independent contractor. First, she determined how many hours she worked for Builderdome and when she worked those hours. *Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 77 (2d Cir. 2020) (emphasizing that schedule flexibility "weigh[s] in favor of independent contractor status because setting one's

17

own hours demonstrates a lack of control by the putative employer and initiative on behalf of the worker"). Builderdome did not set a start time for her work or an end time for that work or monitor the number of hours she worked in a day, a week, or a month. In her words, she worked whatever hours she believed were necessary for her to complete the project. Second, the projects themselves were not dictated by Builderdome or by Rozengaus, except within the broad confines laid out above. *See, e.g., Arena v. Delux Transp. Servs., Inc.*, 3 F. Supp. 3d 1, 11 (E.D.N.Y. 2014) (holding that when a plaintiff driver was given general guidelines and instructions but was not penalized for failing to adhere to such guidelines, the defendant employer did not exercise sufficient control over the plaintiff to establish an employee-employer relationship). According to Ivanov's own account, the decision to redesign the platform was based on the exigencies of the investing market—as determined by the group—and did not come from a direction from Rozengaus or anyone who could be said to be in a position of management. Moreover, within her area of expertise—visual design—Ivanov also had nearly complete discretion. Rozengaus might say whether he liked a design or not, but he did not tell her how to perform her work. Finally, it is significant that neither Builderdome nor Rozengaus set limits on the other persons or companies for whom Ivanov could work or the number of hours for which she worked for them. *Saleem v. Corp. Transp. Grp.*, Ltd., 52 F. Supp. 3d 526, 538 (S.D.N.Y. 2014), *aff'd sub nom. Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131 (2d Cir. 2017) (noting that the degree of control exercised over plaintiff drivers by a defendant car service company was limited where the drivers could, and frequently did, work for other car services); *see also Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (noting the absence of a covenant-not-to-compete clause in the employment agreement supports a finding that the plaintiff was an independent contractor); *Kinney v. Artist & Brand Agency LLC*, 2015 WL

10714080, at *14 (S.D.N.Y. Nov. 25, 2015) ("[i]t has also been found that a purported employer exercises a degree of control where the plaintiff works *exclusively* for that entity").

The next factor is "the worker's opportunity for profit or loss and their investment in the business." *Brock*, 840 F.2d at 1058-59. "In determining whether a worker had an opportunity for independent profit or loss and investment in the business, courts have considered whether workers . . . made decisions affecting their overall profitability . . . or invested in the business." *Thomas v. TXX Servs., Inc.*, 2021 WL 1034677, at *8 (E.D.N.Y. Mar. 15, 2021). The logic is that where a worker is also an investor, an inference can be drawn that she is "in business for [herself]," *Brock*, 840 F.2d at 1059; such a worker faces the possibility of experiencing gain or loss based upon the business's fortunes, and not just the loss of wages, *see, e.g. Sec'y of Lab., U.S. Dep't of Lab. v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987) (holding that migrant farmers were employees, in part because they did not share the risk of loss in the business). A workers' investment in a business might also be some evidence of the control she enjoys both the income of the company for whom she works and her own income and work schedule. *See Mikhaylov v. Y & B Transp. Co.*, 2019 WL 1492907, at *7 (E.D.N.Y. Marc. 31, 2019).

Ivanov had substantial opportunity for profit and loss in the business and made a substantial investment in it in the form of her time. Under the Agreement, by performing her work with Builderdome and continuing to engage with the company, she became entitled to a 1% interest in what she and Rozengaus expected to be at least a multi-million dollar company, the first quarter of her shares to vest after one year, and the remainder to vest after four years. Ex. 3 at 2. A company cannot avoid its obligations under FLSA or the NYLL solely by the expedient of compensating a worker in the form of equity and then stating that factor alone demonstrates that the worker is not an employee. *See* 29 U.S.C. § 203(m); 29 C.F.R. § 531.32 (clarifying that

"shares of capital stock in an employer company, representing only a contingent proprietary right to participate in profits and losses or in the assets of the company at some future dissolution date" do not constitute wages); *Guiry v. Goldman, Sachs & Co.,* 814 N.Y.S.2d 617, 617 (2006) (noting that equity-based compensation is "not included in the definition of 'wages' under [New York] Labor Law § 190(1)'").  But the fact that Ivanov was promised a 1% share of what Rozengaus represented to be a potential multi-billion dollar company weighs in favor of Ivanov being an owner and investor and against Ivanov being considered solely an employee.

Ivanov exercised a high "degree of skill" and was required to show substantial independent initiative to perform her work.  She was the only person on the Builderdome team with visual design experience and expertise.  *See Brock*, 840 F.2d at 1060 (finding a high degree of skill is indicative of independent contractor status but is not dispositive); *see also Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005).  Builderdome was intended as an internet company for contractors and home builders; Rozengaus's background was in construction.  Coto's background was in computer science and app development; he served as the Chief Technology Officer of Builderdome.  Ivanov Dep. 40:3-8; Rozengaus Dep. 60:4-6.  The record does not demonstrate that either had any background in visual design or any ability to tell Ivanov what to do, other than to say whether they liked a design or not.  It was up to Ivanov to design a website and a mobile application that she believed would be attractive to Builderdome's future customers and thereby to Builderdome's potential investors.  Her independent initiative is demonstrated by an email chain—one of the few documents Ivanov offered as evidence of her work.  Ex. 7.  In that email chain, from early January 2016, Ivanov presents to Rozengaus mock-ups of website landing pages and home pages to present to investors.  Her language is telling.  She does not ask for advice or request Rozengaus's approval.

She states, in apparent response to a question of his, "We will figure it out.  This is just for you to present to investors. Work in progress" and then after Rozengaus suggests that the website include photographs of Builderdome personnel, declares: "The logo will go in the square.  I just put photo in there for now, but its [sic] like linkedin."  *Id*. at 2.  Ivanov further declares: "Here are some mockups.  I am sure we will need to edit them but I think it is good enough for the time being."  *Id.*  Rozengaus is limited to making "minor comments."  *Id.*  The only discernible difference between the work Ivanov did with Builderdome and the work she testified that she continued to do for other clients was that the work for Builderdome was more sustained and was done in exchange for the promise that, if Builderdome was successful in raising funds she would have a full-time job and an equity stake.

The next factor is "the permanence or duration of the working relationship."  *Brock*, 840 F.2d at 1058-59.  Courts analyzing this factor consider: (1) the duration of the working relationship between parties; and (2) whether the workers were free to perform work for others while working for the company in question.  *Mikhaylov*, 2019 WL 1492907, at *7.  Courts will also consider the length of the working relationship.  *See Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 456 (S.D.N.Y. 2002) (working relationship of eight years supports classification as employee).  "Where the record indicates that a worker performed a job on 'essentially a full-time basis,' this factor favors a finding that the worker is an employee as opposed to an independent contractor."  *Id*. (quoting *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 351-32 (E.D.N.Y. 2015)).

With respect to this factor, some facts here favor a finding that Ivanov was an employee, while others favor a finding that she was a contractor.  On the one hand, the fact that Ivanov worked at Builderdome for nearly two years and on what she characterized as a full-time basis

weighs in favor of a finding that she was an employee.  *See, e.g., Kinney v. Artist & Brand Agency LLC*, 2015 WL 10714080, at *16 (S.D.N.Y. Nov. 25, 2015) (holding that a working relationship of approximately two years weighed in favor of a finding that the worker was an employee).  Her work was not episodic in nature as one what expect of an independent contractor but was of a somewhat durable nature.  On the other hand, Ivanov's commitment was not that such was unable to enjoy other employment, and on her own schedule, at the same time she was performing work for Builderdome.  She was free to, and did, continue to perform work for numerous others and at her own discretion while working for Builderdome.  *See Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 141 (2d Cir. 2017) (where an individual is able to draw income through work from others, the relationship weighs in favor of independent contractor status).  Her work for Builderdome was largely project-specific—to help launch Builderdome—and she was largely free to determine its duration—she would continue to be engaged as long as she wanted and was necessary to enjoy an equity stake and an offer of full-time employment.  At the outset, her expectation and that of Rozengaus was that the period of time until funding was three months.  The period ended up lasting longer but that was not a function of a change in the nature of her work relationship or of anything that was contemplated when she formed the relationship with Builderdome or that was inherent to that relationship.  It was extended because Builderdome continued to be disappointed in its efforts to obtain financing and because Ivanov, lured by the "carrot in front of the nose" and by Rozengaus's continued optimism, decided to stick it out just a little bit longer.  It is telling in this regard that when Ivanov—busy with childcare responsibilities—decided no longer to work with Builderdome, she did not tell Rozengaus or anyone else at Builderdome.  She simply just decided to stop working.  On balance, this factor weighs against her being an employee.

The last *Brock* factor is "the extent to which the work is an integral part of the employer's business." *Brock*, 840 F.2d at 1059.  The integral-economic-factor "relates not to the percentage of total work done by the workers at issue but to the *nature* of the work performed by the workers." *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1385 (3d Cir. 1985); *see also Saleem*, 52 F. Supp. 3d at 543 (S.D.N.Y. 2014) (finding that car drivers were integral to the defendant's car service business); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 195 (S.D.N.Y. 2003) (finding delivery workers constituted an integral part of a pharmaceutical business as the "convenience of shopping from home" was central to the company's offerings).

Analysis of the "integral-economic-factor" presents a vexing challenge.  To some extent everyone who performs work for an economic enterprise is "integral" to that enterprise in the sense that she or her position is not dispensable.  It is an unusual company, and one that will not be likely to survive, that will continue to pay a worker—whether an independent contractors or employee—anything for their labor if that labor is not necessary.[6]  The factor draws its meaning and its substance from its history.  The language appears to have its origin in the Supreme Court decision in *United States v. Silk*, 331 U.S. 704 (1947) —the case from which the "economic reality test" derives—in which the Supreme Court evaluated whether unloaders of railway coal cars and truckers who made retail deliveries on behalf of a retail coalyard were employees or

---

[6] *See, e.g.*, *Lauritzen*, 835 F.2d at 1541  (Easterbrook, J., concurring) ("[T]he 'extent to which the service rendered is an integral part of the employer's business,' is one of those bits of 'reality' that has neither significance nor meaning.  *Everything* the employer does is 'integral' to its business—why else do it? . . . An omission to design a building would be fatal to an effort to build it, but this does not imply that architects are the 'employees' of firms that want to erect new buildings.  Acquiring tires is integral to the business of Chrysler, but the tires come from independent contractors.  Perhaps 'integral' in this formulation could mean 'part of an integra*ted* operation', which would distinguish tires but leave unanswered the question why the difference should have a legal consequence.").

instead contractors for purposes of the Social Security Act.  *Id.* at 706.  In the course of listing

the factors relevant to determining "the limits of the employer-employee relationship," *Id.* at 716,

the Court listed many of the factors that later found their way into *Brock* and then added that

"[t]hese unloaders and truckers and their assistants are from one standpoint an integral part of the

businesses of retailing coal or transporting freight" in the sense that "[t]heir energy, care and

judgment may conserve their equipment or increase their earnings."  *Id.* at 716.

The *Silk* language thus suggests that the question for the court is whether the worker's job

is directed towards an aim that is central to the business's mission, or whether, instead, their

work is peripheral to its aims.  A person whose work is less central to the enterprise's mission

may be more independent and thus less likely to be an employee.  The fifth factor favors a

finding that Ivanov was an employee and not an independent contractor.  Builderdome was in the

business of developing a website, and Ivanov was working for the company as a web developer.

At the same time, the factor is not dispositive.  In *Silk* itself, after determining that the unloaders

and truckers were "integral," the Court ruled that the truckers were independent and not

employees and ruled that the unloaders were employees but not because they were integral.  It

was because they "had no opportunity to gain or lose except from the work of their hands and

these simple tools [of picks and shovels]."  *Id.* at 717.

Finally, under *Brock*, in addition to the five factors, the Court may consider the "totality

of the circumstances."  *Brock*, 840 F.2d at 1059.  Although not listed specifically as a *Brock*

factor, the parties' shared understandings of the nature of their relationship must have some

bearing on the question of whether a person is an employee or an independent contractor.

*Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 595 (E.D.N.Y. 2012) (noting the named

plaintiff "understood" he would be treated as an independent contractor and that the

classification "was important to him"); *Mikhaylov*, 2019 WL 1492907, at *7 (designation as independent contractor or employee is "'pertinent to the parties' beliefs about the nature of the relationship'") (quoting *Saleem*, 854 F.3d at 131). Apart from any other reason, an understanding that a person is an employee would itself bear on the parties' shared understandings of the control that could be exercised over that person's work.

On close review, the Agreement does not establish a shared understanding that Ivanov and Builderdome had an employer-employee relationship. On the one hand, there are portions of that Agreement that are suggestive that the parties shared an understanding that Ivanov was an employee and Builderdome was an employer from the beginning of their relationship. The Agreement is entitled "Employment Agreement" and Ivanov and Rozengaus sign as "Employee" and "Employer" respectively. Ex. 3. Ivanov is referred to throughout as Employee, agrees to "comply with all Employer policies, procedures, rules and regulations, both written and oral, as are announced by the Employer from time to time," and agrees to perform the duties "assigned to the Employee." *Id*. It even refers to Ivanov's "employment before the funding stage." *Id.* Other provisions of the Agreement cut the other way, however, particularly those inserted by Rozengaus to reflect his adaptation of the form agreement to the arrangement he discussed with Plaintiff. The Agreement "guarantees [Ivanov a] full-time position depending on the substantial amount of funding required to complete the project." It thus leaves the plain implication that, prior to any funding, she would not have a full-time position and that the "employment" that is being discussed by the Agreement is Builderdome's agreement to provide her future employment. It states that "vacation, Benefits, Stock Venting [sic] Period and Performance Reviews would be determine during full-time employment negotiation" and thereby expressly indicates that there have not been negotiations over "full-time employment"—and that what

Ivanov had is something less or different than full-time employment.  The "policies, procedures, rules and regulations," to which the Agreement refers had not been implemented.  At the time Ivanov joined Builderdome there were only two people working on the company—herself and Rozengaus.  Finally, the Agreement lacks many of the basic terms that would be required of an employment agreement—a description of the position, a specification of the number of hours Ivanov was to work, any rate that she was to be paid, any binding restrictive covenants, and any consequences of termination for cause and without cause.  The Agreement thus is equivocal and ambiguous.  It could be read to establish an employer-employee relationship from the moment Ivanov began to work with Builderdome.  It also could be read to establish an agreement by Builderdome to provide future employment and equity in exchange for Ivanov's work in helping the company raise funding.

The conclusion that the parties' shared understanding does not establish an employment relationship is reinforced by two additional facts.  First, the Court finds that Rozengaus and Ivanov did not discuss an employer-employee relationship or agree to such a relationship when they agreed to engage with one another.  Ivanov did not remember much of the conversation when the two first met other than that Rozengaus described his plans for the company to her and promised to send her a proposed agreement.  The two did not discuss terms of the relationship. In every previous engagement Ivanov had had, she was either paid by the hour or by the project. Ivanov Dep. 54:1-7.  She did not discuss any of that with Rozengaus.  *Id.* 54:8-10.  Rozengaus, by contrast, stated that "[t]he clear verbal understanding between [Ivanov] and my self [sic] was that in consideration of her and others' investment of time and skill in starting up Builderdome, assuming we eventually get adequate funding from other investors, she would have a great full-time job in to the infinite future with great pay in a multi million dollar company and one percent

of the company's revenues and shares," and that "[a]t no time did [Ivanov] and I agree that she was to be considered an employee, as I now understand that term to be legally defined, of Builderdome up until the company gets off the ground with financial funding."  Rozengaus Aff. ¶¶ 6, 9.  The Court considers Rozengaus's account to be the more credible.

Second, at no time over the two-year period did Builderdome offer Ivanov a paycheck or did Ivanov ask for pay or complain that she did not receive a paycheck.  Ivanov Dep. 46:3-13. She did not send an invoice or any bill for her work.  Ivanov Dep. 54:24-55:6.  Nor did she ever agree in writing with Rozengaus on an hourly or daily rate for her work.  Ivanov Dep. 54:8-10. As defense counsel suggested in one of his questions at deposition, the "crux" of the matter was that Ivanov treated her relationship with Builderdome not as "an employee in this company but [as part] of a partnership team."  Ivanov. Dep. 52:21-53:4.[7]

## II.    New York Labor Law

The NYLL defines an "employee" as "any individual employed or permitted to work by an employer."  N.Y. Lab. L. § 651.  The evaluation of the status of a worker as an employee under the NYLL is analyzed under a framework similar to that used to evaluate claims under the FLSA. "There is general support for giving FLSA and the New York Labor Law consistent interpretations [and] there appears to never have been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." *Meyer v. U.S. Tennis Ass'n*, 2014 WL 4495185, at *9 (S.D.N.Y. Sept. 11, 2014), aff'd, 607 F. App'x 121 (2d Cir.

---

[7] Ivanov disagreed with the characterization at deposition but her disagreement was based on the fact that she did not have a vote on whether to take on new funding and not on anything in the nature of her relationship with Builderdome:  "We did have shares, but we were all employees still, even though the shares would come after the company became.  Before then, what are we supposed to be, employees, right? If our vote doesn't [m]atter, then how are we anything more than that?"  Ivanov Dep. 53:5-11.

2015) (citing *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 924 (S.D.N.Y. 2013))

(internal citation and quotation marks omitted).  The test set forth by the New York Court of

Appeals for evaluating employee status under the NYLL is only slightly different from the

Second Circuit's test for evaluating employee status under FLSA.  "[T]he critical inquiry in

determining whether an employment relationship exists pertains to the degree of control

exercised by the purported employer over the results produced or the means used to achieve the

results."  *Bynog v. Cipriani Grp., Inc*, 802 N.E.2d 1090, 1092-93 (N.Y. 2003).  In evaluating the

degree of control the employer exercised, courts consider the following factors: (1) whether the

worker worked at her own convenience; (2) was free to engage in other employment; (3)

received fringe benefits; (4) was on the employer's payroll; and (5) was on a fixed schedule.

*Hart*, 967 F. Supp. 2d at 923.

The analysis under the NYLL is more straightforward than the analysis under FLSA.  By

her own account, Ivanov worked at her own convenience.  She set her own schedule and she

worked the hours that she believed were necessary to do the jobs she had agreed to engage in for

the company.  The only constraint on her time was the obligation to attend the Saturday

meetings.  *Browning*, 885 F. Supp. 2d at 600 (citing plaintiffs' ability to pick their own

assignments and choose which days of the week they worked as evidence that they "worked at

their own convenience").  Ivanov also was free to engage in other employment and did so,

remaining on the retainer of one company while working for Builderdome and taking on

assignments for others, all without the need to obtain the permission of or even provide notice to

Builderdome.  *Saleem*, 52 F. Supp. 3d at 544 (finding plaintiffs were "free to engage in other

employment" because the defendants did not prevent the plaintiffs from working with other

companies or require that the plaintiffs accept certain jobs). Ivanov did not receive fringe

benefits the way an employee might receive fringe benefits.  No one working on the Builderdome project received any benefits.  Finally, there was no payroll for Builderdome.  For these reasons, Ivanov was not an employee under the New York Labor Law.

## III.   Breach of Contract

Ivanov alleges Builderdome breached the Agreement in two different respects.  First, it failed to pay her minimum wage or her market value for the hours she worked for the company.  Second, it failed to take an available investment and thereby deprived Ivanov of the value of her equity investment.  Tr. 70:3-8.

Under New York law, the elements of a breach of contract claim are: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 30-31 (S.D.N.Y. 2010).  "To form a valid contract requires 'an offer, acceptance, consideration, mutual assent and intent to be bound.'"  *Id.* at 31 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009)).  Moreover, "[u]nder New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."  *Advanced Water Techs., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 318 (S.D.N.Y. 2020) (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)) (internal citations and quotations omitted).  "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Id.* (quoting *Harris*, 310 F.3d at 81).

Ivanov cannot prevail on either of her theories.  Builderdome did not breach the Agreement with her by failing to pay her minimum wage or market value for the hours she worked for the company.  It never agreed to pay her any wage at all prior to the time it obtained

funding.  To the contrary, the Agreement is explicit.  It states: "It is understood by Employee [Ivanov] that [s]he will not be compensated until seed round closes" and "The employee agrees to get compensated only after the Employer gets funded."  Ex. 3.  The only provision it contains about the wages Ivanov will be paid stipulates that when and if the Company received funding, Ivanov would receive a "full-time position" and "compensation . . . based on the market salary based on the experience."  If she left "before the funding stage," she would be entitled to reimbursement for the unpaid period but "only after and if the Employer gets funded."  Ex. 3.  Builderdome never was funded, the seed round never closed, and no right to compensation under the contract ever materialized.

The Second Circuit has recognized "two paths to establish a breach of contract claim" under New York law: "breach of the express terms or breach of '[i]mplied contractual obligations.'"  *Giller v. Oracle USA, Inc.*, 512 F. App'x 71, 73 (2d Cir. 2013) (quoting *Wakefield v. N. Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir. 1985)).  Implied in the Agreement was an obligation on the part of Builderdome and Rozengaus to exercise good faith in attempting to obtain funding.  *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) ("Under New York law, a covenant of good faith and fair dealing is implied in all contracts") (quoting *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 747 N.Y.S.2d 29, 31 (2d Dep't 2002)); *see also Joshi v. Trustees of Columbia Univ. in City of New York*, 2021 WL 236032 at *16 (S.D.N.Y. Jan. 25, 2021) ("[the] covenant of good faith and fair dealing 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'") (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 773 N.E.2d 496, 500 (2002)).  Builderdome and Ivanov could not continue to take Ivanov's labor and work product and simply

fail to attempt to reach out to investors or indiscriminately reject offers of financing without frustrating the terms of the agreement with her. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 663 N.E.2d 289, 389 (1995) ("[w]here the contract contemplates the exercise of discretion, [the implied obligation of good faith] includes a promise not to act arbitrarily or irrationally in exercising that discretion"); *Peacock v. Herald Square Loft Corp.*, 67 A.D.3d 442, 889 N.Y.S.2d 22, 24 (2009) ("[e]ven if the… agreement does not, on its face, set limits on the board's ability to refuse to approve the scope of work, the contract's implied covenant of good faith and fair dealing would prevent defendants from exercising that power arbitrarily").

The evidence at trial did not establish that Rozengaus and Builderdome violated the duty of good faith and fair dealing. Rozengaus reached out to potential investors through LinkedIn and other start-up investment websites. Tr. 134:13-23. Ivanov herself testified to the extensive efforts the group went through in order to obtain financing, including "updating the designs . . ., chang[ing] the content on the website, modify[ing] the pitch deck" and hiring additional consultants. Tr. 48:1-9. The fact that Rozengaus turned down the single offer of financing he received does not establish that he or Builderdome violated the duty of good faith and fair dealing. Rozengaus proffered legitimate, non-arbitrary reasons for not accepting the financing: the investment of $1 million or $1.5 million would not be sufficient to launch or operate the company and Builderdome's acceptance of the terms from the single investor would make it less attractive to future investors, thus potentially dooming the company for the long run. Tr. 123:16-124:1. In hindsight, Rozengaus's hopes and predictions that there would be future funding were mistaken. No other investors emerged. But Rozengaus and Builderdome were not required in considering the offer from the single investor to assume that all their future efforts would come to naught. No provision in the Agreement obligated Rozengaus to run the Company

essentially in run-down mode, taking money from an investor only to pay it out to Ivanov and the other team members without using any of it to invest in the Company's future profitability.  *See* Tr. 101-102; *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003) ("the obligation of good faith does not create obligations that go beyond those intended and stated in the language of the contract"); *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 2021 WL 621235 at *7 (S.D.N.Y. Feb. 17, 2021) (noting the implied covenant of good faith does not provide parties with benefits to which they were "not entitled").

## IV.    Unjust Enrichment

Plaintiff pleads a claim for unjust enrichment in the alternative.  She claims she is entitled to $120,000, which she alleges is the fair market value for the services she provided as Creative Director during her tenure at Builderdome.  Ivanov Aff. ¶84.

In order to be entitled to remedies for unjust enrichment under New York law, a party must show that: "(1) the other party was enriched; (2) at that party's expense; and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'"  *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (quoting *Citibank, N.A. v. Walker*, 787 N.Y.S.2d 48, 48 (2d Dep't 2004)).  "[T]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties."  *Ga. Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012).  "Unjust enrichment claims are available 'only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff,' such as when 'the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled.'"  *In re Columbia Tuition Refund Action*, 2021

WL 790638, at *9 (S.D.N.Y. Feb. 26, 2021) (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)).

However, the existence of a valid contract precludes a claim for unjust enrichment.  *See Ainero Concrete Co. v. N.Y.C. Constr. Auth.*, 308 F. Supp. 2d 164, 179 (S.D.N.Y. 2003) (holding that a claim for unjust enrichment is a "non-contractual, equitable remed[y] that [is] inapplicable if there is an enforceable contract governing the subject matter.") (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997)); *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d Cir. 1996) (holding that the existence of an enforceable contract governing a particular subject matter "ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.").

That proposition is fatal to Plaintiff's claim here.  The parties reached an Agreement on the value Ivanov would receive for the services she performed for Builderdome.  If she stayed through the funding stage, she would receive an offer of full-time employment at a market salary.  Even if she left before the company was funded, she would receive 1% of the equity in the company and reimbursement for the unpaid period—after and if Builderdome was funded. That agreement fully covered Ivanov's claim of unjust enrichment for the work she did for Builderdome before it was funded.  She, like others, might have been disappointed that Builderdome was not funded.  But that disappointment does not give rise to a claim for relief in quasi-contract when the plain terms of her Agreement also cover that same subject matter and deny her any basis for relief.

## V.      Gender and Pregnancy Discrimination

Finally, Ivanov brings claims for pregnancy discrimination under the NYSHRL and the NYCHRL based on Builderdome's alleged termination of her employment and reduction of her

title.  The Court considers both the termination and the reduction in title issues in turn.  It finds

that the Plaintiff has not established a valid discrimination claim for either.

"Though neither the NYSHRL nor the NYCHRL explicitly names pregnancy as a type of

actionable discrimination, courts have deemed pregnancy discrimination actionable under both

laws."  *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 357 (S.D.N.Y. 2012).

NYSHRL and NYCHRL pregnancy discrimination claims are analyzed under the

burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  To establish a

prima facie case of pregnancy discrimination under the *McDonnell Douglas* framework, the

plaintiff must show that (1) she is a member of the protected class, (2) she was qualified for her

position, (3) she suffered an adverse employment action, and (4) such action occurred under

circumstances giving rise to an inference of discrimination.  *E.E.O.C. v. Bloomberg L.P.*, 967 F.

Supp. 2d 816, 833 (S.D.N.Y. 2013).  "A plaintiff's burden to establish a prima facie case of

discrimination is de minimis."  *Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 277

(S.D.N.Y. 2008).

"An adverse employment action is a materially adverse change in the terms and

conditions of employment."  *E.E.O.C.*, 967 F. Supp. 2d at 843 (quoting *Sanders v. New York

City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)) (internal citation and quotation marks

omitted).  Examples of materially adverse changes include, "termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices . . . unique to a

particular situation."  *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).

Termination constitutes an adverse employment action, but Plaintiff cannot claim that she

was terminated by Builderdome.  Ivanov admitted that she did not receive any communication

from Rozengaus or Builderdome terminating her employment.  Tr. 26:17-25.  She attributes her departure to "self-discovery," *id.*, and did not speak to Rozengaus or Coto about her status as an employee.  Tr. 41:18-42:7.  Thus, Plaintiff's departure was voluntary and cannot be considered discriminatory termination.

Plaintiff also alleges Rozengaus's decisions to change Ivanov's title on the Builderdome website from "creative director" to "designer consultant" and eventually to remove Ivanov's profile from the website constitute adverse employment actions.  While demotions might constitute adverse employment actions, *see E.E.O.C.*, 967 F. Supp. 2d at 843, "a change in job title without any change in duties, compensation, benefits or reporting structure, is not an adverse employment action."  *Mitchell v. Am. Online, Inc.*, 286 F. Supp. 2d 325, 327 (S.D.N.Y. 2003); *see also, White v. Fuji Photo Film USA, Inc.*, 434 F. Supp. 2d 144, 152 (S.D.N.Y. 2006).  The change in Plaintiff's title did not affect the terms or conditions of her employment with Builderdome.  Thus, the title change alone in the absence of any accompanying negative results does not constitute an adverse employment action.

Finally, even if the title reduction or unilateral removal of the Plaintiff's profile from the Builderdome website established a prima facie case, the burden merely shifts to Builderdome "to articulate a legitimate, clear, specific, and non-discriminatory reason for discharging the employee."  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 87 (2d Cir. 2005).  Rozengaus expressed non-discriminatory reasons for both changing Ivanov's title and removing her profile from the website.  He changed Ivanov's title to "designer consultant" because she could not attend meetings with investors.  Rozengaus Aff. ¶ 34; Tr. 104:25-105:18.  Rozengaus removed Ivanov's name from the website to make the team appear "as lean as possible" for when Builderdome approached potential investors.  Tr. 110:11-24; Rozengaus Dep. 66:9-67:19.

For these reasons, Plaintiff's pregnancy discrimination claims under the NYSHRL and NYCHRL must fail.

## CONCLUSION

For the reasons stated, the Clerk of Court is respectfully directed to enter judgment in favor of Defendants, terminate all pending motions, and close the case.

SO ORDERED.

Dated: June 22, 2021
      New York, New York

_____
                LEWIS J. LIMAN
                United States District Judge